**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **LISA CARDENAS MOUTAWAKIL,** ) | |
| 4011 Roberts Road ) | |
| Fairfax, VA 22032 ) | **CIVIL ACTION NO.** |
| ) | |
| *Plaintiff,* ) | |
| ) | **JURY TRIAL DEMANDED** |
| **v.** ) | |
| ) | |
| **NORTHERN VIRGINIA** ) | |
| **PERIODONTICS, PLLC,** ) | |
| *Serve*: A Garrett Gouldin, Registered Agent ) | |
| 103 West Broad Street, Suite 601 ) | |
| Falls Church, VA 22046 ) | |
| ) | |
| *Defendant.* | |

**COMPLAINT**

---

Plaintiff, Lisa Cardenas Moutawakil ("Plaintiff' or "Ms. Moutawakil") brings this Complaint against Defendant Northern Virginia Periodontics, PLLC ("Defendant" or "NVP") to redress violations of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 200e *et seq.* ("Title VII"), the Virginia Human Rights Act, Va. Code Ann. §§ 2.2-3900 *et seq.* ("VHRA"), the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the Virginia Overtime Wage Act, Va. Code Ann. § 40.1-29.2 ("VOWA"), and the Virginia Wage Payment Act, Va. Code Ann. § 40.1-29 *et seq.* ("VWPA"). Ms. Moutawakil, a former Registered Dental Hygienist employed by Defendant from April 2015 through August 19, 2024, was subjected to unlawful discrimination based on her disabilities and her national origin. Throughout her nearly nine-year tenure, Defendant repeatedly denied Ms. Moutawakil's requests for reasonable accommodations necessary to perform her job duties, including scheduling modifications to attend therapy appointments, administrative support,

1

and appropriate equipment. Despite her exemplary patient care and positive performance reviews, Defendant subjected Ms. Moutawakil to heightened scrutiny, removed critical workplace support, denied accommodation requests citing "production loss," and ultimately terminated her employment in retaliation for engaging in protected activity. Additionally, Defendant required Ms. Moutawakil to work off the clock to complete administrative tasks, in violation of federal and state wage and hour laws.

## PARTIES

1.      Ms. Moutawakil is a Hispanic woman of Mexican descent, an individual with disabilities, and was an employee of Defendant within the meaning of the Americans with Disabilities Act, Title VII, the Virginia Human Rights Act, the Fair Labor Standards Act, the Virginia Overtime Wage Act, and the Virginia Wage Payment Act.

2.      Ms. Moutawakil was employed by Defendant as a Registered Dental Hygienist from April 2015 until her termination on August 19, 2024.

3.      Ms. Moutawakil was a resident of Virginia for all times relevant to the allegations in this Complaint.

4.      NVP is a professional limited liability company organized under the laws of Virginia.

5.      NVP is an employer within the meaning of the ADA, Title VII, the VHRA, the FLSA, the VOWA, and the VWPA, employing fifteen or more employees at all times relevant to this action.

6.      NVP's principal place of business is located at 103 West Broad Street, Suite 601, Falls Church, Virginia 22046. Defendant operates a periodontics practice specializing in the treatment of gum conditions, bone health, and dental implants, with offices located at 103 West

Broad Street, Suite 601, Falls Church, Virginia 22046, and 1900 Duke Street, Suite 110, Alexandria, Virginia 22314.

7.    At all times relevant to this action, NVP employed Ms. Moutawakil's and was her when the adverse employment actions alleged herein occurred.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over Ms. Moutawakil's claims pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*

9.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 and the jurisdictional provisions of the ADA and the FLSA because Ms. Moutawakil seeks to redress the deprivation of rights secured by federal civil rights statutes.

10.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Ms. Moutawakil's state law claims arising under the VHRA, VOWA, and VWPA, because these claims form part of the same case or controversy as Ms. Moutawakil's federal claims.

11.    This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in this judicial district, employs workers in this district, and the events giving rise to the claims alleged herein occurred in this district.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant maintains offices and conducts business in this district, a substantial part of the events or omissions giving rise to Ms. Moutawakil's claims occurred in this district, and Defendant resides in this district for purposes of venue.

**ADMINISTRATIVE PREREQUISITES AND EXHAUSTION**

12.     Prior to instituting this action, Ms. Moutawakil timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on March 20, 2025. The Charge was assigned EEOC Charge No. 570-2025-02288 and alleged discrimination based on disability, national origin, and retaliation, covering conduct from March 2022 through August 2024.

13.     On February 11, 2026, more than 180 days after filing her Charge, Ms. Moutawakil received a Notice of Right to Sue from the EEOC.

14.     Ms. Moutawakil filed this action within 90 days of receipt of her Notice of Right to Sue and has satisfied all administrative prerequisites to bringing this action.

**FACTUAL ALLEGATIONS**

**Ms. Moutawakil's Employment and Positive Work History**

15.     Ms. Moutawakil began working for Defendant Northern Virginia Periodontics, PLLC on April 13, 2015, as a Registered Dental Hygienist.

16.     Ms. Moutawakil performed her job well and consistently received positive performance reviews throughout her tenure. Her April 13, 2023, performance evaluation noted that "Patients love you! You are firm but not painful" and reflected that she was meeting or exceeding expectations in her clinical work.

18.     For approximately eight years, from 2015 until January 2023, Ms. Moutawakil was the only full-time hygienist at the practice, working at Defendant's Falls Church and Alexandria office locations.

19.     Ms. Moutawakil's primary responsibilities included providing dental cleanings, scaling, and root planning for patients, educating patients, coordinating patient management, completing treatment documentation, and working with the periodontists on treatment plans.

20.     By April 2023, Ms. Moutawakil's hourly rate was $64.50 per hour. She worked as a non-exempt hourly employee and was not subject to any exemptions under the FLSA.

**Ms. Moutawakil's Disabilities and Diagnoses**

21.     In 2015, Ms. Moutawakil began taking medication to manage symptoms of diagnosed disabilities of anxiety and depression under the care of a physician.

22.     Due to her disabilities, Ms. Moutawakil experienced panic attacks, uncontrollable crying, and shortness of breath. At times, these episodes caused her to lose her breath while working on patients and occasionally forced her to leave work early.

23.     In Spring 2022, after experiencing ongoing lethargy, alertness issues, and what appeared to be a disconnect during a morning huddle, Ms. Moutawakil reported her symptoms to management. Dr. Francisco Carlos, one of the practice owners, referred her to a psychiatrist for evaluation.

24.     On July 7, 2022, Dr. Maria Carmen V. Gonzales-Vigilar diagnosed Ms. Moutawakil with Attention Deficit Hyperactivity Disorder (ADHD), inattentive type, and anxiety. Dr. Carlos stated that he was "not surprised" by the diagnosis and that he "already knew" what her diagnosis would be.

25.     Dr. Gonzales-Vigilar prescribed Xanax to help Ms. Moutawakil regain her composure during panic attacks. Despite this treatment, in 2023, Ms. Moutawakil's panic attacks and anxiety worsened, initially occurring about once per month and eventually escalating to almost weekly episodes.

26.     In 2022, Ms. Moutawakil was also diagnosed with Panic Disorder. By late 2023, due to the stresses of her position and the discriminatory treatment she endured, Ms. Moutawakil's symptoms had significantly worsened, making it increasingly difficult for her to manage her administrative tasks, maintain concentration, and regulate her emotional responses at work.

26.     On January 19, 2024, Ms. Moutawakil informed management that she had received a new diagnosis of Premenstrual Dysphoric Disorder (PMDD), had started new medication, and would have a follow-up with her doctor in 30 days.

27.     These conditions substantially limited major life activities including concentration, memory, communication, and work performance.

**Early Accommodation Efforts and Management Changes**

28.     In February 2023, Ms. Moutawakil requested accommodations from her manager, Christina Scandiffio, to assist with the management of her symptoms at work. Specifically, she suggested strategies to help with administrative tasks and deadlines so they would not interfere with her ability to provide patient care.

29.     Ms. Scandiffio worked with Ms. Moutawakil to implement changes that were effective in managing Ms. Moutawakil's ADHD, anxiety, and depression symptoms while at work.

30.     In June 2023, before the accommodations could be fully implemented, Ms. Scandiffio left the practice and was replaced by Juan Arellano as office manager. After this management change, Ms. Moutawakil's work environment changed significantly, and Defendant's approach to her accommodation requests became markedly different.

**Schedule Changes and Increased Workplace Stress**

31.     In January 2023, Defendant made a major shift in the internal system that significantly increased Ms. Moutawakil's stress and worsened her disability-related symptoms.

32.    For the previous eight years, Ms. Moutawakil had been the only full-time hygienist at the practice.

33.    However, in January 2023, management revised the hygienist schedule and instructed all hygienists not to come into the office on Mondays due to a lack of scheduled patients. As a result, Ms. Moutawakil's hours were significantly reduced, which limited her income.

34.    Despite the reduced hours, management began putting increased pressure on employees. They heightened scrutiny of employees' movements and increased expectations without providing additional support. Before her shifts, Ms. Moutawakil repeatedly received text messages questioning her whereabouts.

34.    If Ms. Moutawakil used the bathroom or took a break during her shift, management immediately confronted her, demanding to know why she was not in her treatment room.

35.    This combination of increased pressure, lack of support, reduced hours, and exclusion from decision-making further exacerbated Ms. Moutawakil's stress and disability-related symptoms, making it increasingly difficult for her to function in her role.

**<u>Assistant Support Provided Then Withdrawn</u>**

36.    On February 21, 2023, Defendant hired a Dental Assistant allegedly to assist the doctors. The assistant was inexperienced professionally and did not possess any prior dental experience.

37.    On April 27, 2023, management reassigned the Dental Assistant to Ms. Moutawakil for training. Despite Ms. Moutawakil's medical conditions, management failed to consider how Ms. Moutawakil might struggle to train an inexperienced assistant.

38.    With her already reduced hours, Ms. Moutawakil became overwhelmed, as she was not allocated additional time to train the assistant.

39.     However, once the assistant had been trained to assist Ms. Moutawakil, management reassigned her elsewhere, removing the crucial support that Ms. Moutawakil required and had become reliant upon.

40.     With the assistant's support, Ms. Moutawakil had been able to complete all tasks in a timely fashion. The removal of this support, combined with increased pressure and exclusion from decision-making, further exacerbated Ms. Moutawakil's stress and disability-related symptoms.

**Denial of Equipment and Workspace Accommodations**

41.     In the fall of 2023, even though hygienists needed updated tools to work efficiently and safely, management refused to approve any instrument orders, citing renovation costs at the Alexandria location.

42.     Ms. Moutawakil indicated that she needed new instruments to scale patients' teeth effectively and safely, but management ignored these requests. Ms. Moutawakil's instruments had not been replaced for approximately three years, despite industry standards requiring updates every six to twelve months.

43.     The worn instruments forced Ms. Moutawakil to use more pressure and repeated strokes to remove calculus, which increased hand fatigue and raised the risk of self-injury from the tools or musculoskeletal strain, in addition to increased risk of injuring a patient. This decision not to replace the instruments increased Ms. Moutawakil's physical stress and made it harder to concentrate on her work.

44.     After meeting with Dr. Carlos, Ms. Moutawakil learned that management had no intention of replacing the tools. Dr. Carlos admitted that he did not want to replace the tools because a new hygienist might prefer different ones if a current hygienist quit. Instead of

prioritizing current staff and patient safety, he focused solely on financial concerns and the possible preferences of not-yet-hired staff.

45.     On December 6, 2023, Ms. Moutawakil sent an email to management requesting items to help her perform her job and expressing her ongoing struggles due to her disabilities. These requests included new tools, a second treatment room, an office space to rest away from stimulation, and her own desktop computer to complete administrative notes

46.     Instead of providing Ms. Moutawakil with the requested items or engaging in any meaningful discussion about alternatives, management denied these requests without explaining how they would pose an undue burden or exploring any reasonable alternatives.

**National Origin Discrimination**

47.     Ms. Moutawakil is a Hispanic woman of Mexican and Colombian descent. Spanish is her native language.

48.     On multiple occasions, both Dr. Carlos and Dr. A. Garrett Gouldin admonished Ms. Moutawakil not to communicate with other Spanish-speaking coworkers in Spanish. They claimed that speaking Spanish was "unprofessional" and was not permitted in the office.

49.     Being policed for speaking her native language not only felt discriminatory but also added to Ms. Moutawakil's growing stress and sense of isolation in the workplace. It created an environment where she constantly felt scrutinized, further exacerbating her anxiety and making it even harder to focus on her job.

50.     Neither Defendant nor the individual doctors took any steps to provide Ms. Moutawakil with a legitimate business reason for this language restriction, and no adverse action was taken against non-Hispanic employees for speaking languages other than English in the office.

9

**Repeated Denial of Schedule Accommodations for Medical Treatment**

51.    In November 2023, after much encouragement from her psychiatrist, Ms. Moutawakil decided to see a therapist who specialized in ADHD. The therapist had a very limited schedule and was only available at a specific time on Wednesday afternoons.

52.    Ms. Moutawakil informed management that she would need to start therapy in the new year and requested an accommodation to either take Wednesday afternoons off or leave work two hours early to attend her sessions.

53.    Despite Ms. Moutawakil's ongoing struggles, which she expressed in emails and text messages to her supervisors, management denied her request for therapy accommodations, due to potential "lost production."

54.    This claim had no merit, as Ms. Moutawakil offered to make up the hours on a different day or work through lunch, yet management still refused to accommodate her.

55.    Management failed to offer any alternatives or explain why the requested schedule modification could not be granted.

56.    Since the practice had denied her request for early leave to see a specialist, Ms. Moutawakil started telephonic Cognitive Behavioral Therapy in March 2024. Unfortunately, her therapist informed her that her condition was getting worse, and telephonic sessions were ineffective.

57.    Ms. Moutawakil again requested time off to see an ADHD therapist that her psychiatrist recommended. This time, she spoke directly with Dr. Gouldin rather than going through management, since management had ignored her previous requests. Dr. Gouldin dismissed her, saying, "I don't want to get involved."

58.    Dr. Vishal Gohel overheard this conversation. Ms. Moutawakil later spoke with Dr. Gohel and shared her frustration. He told her that Dr. Gouldin and Practice Manager Munazza Jamil had a complicated, long-running work relationship, which was likely why Dr. Gouldin did not want to get involved.

**Ongoing Requests for Help and Management's Failure to Respond**

59.    On November 16, 2023, Ms. Moutawakil sent an email to management describing an incident with a patient who had a history of seizures. In the email, Ms. Moutawakil wrote that she was "struggling," and that she was "not getting any better with [her] stress, anxiety, depression and ADHD."

60.    Ms. Moutawakil concluded this email stating that the email was "a cry for help," indicating the need for some reasonable accommodation.

61.    On November 29, 2023, Ms. Moutawakil sent a follow-up email to management providing an update on her mental health. She informed them that her psychiatrist had increased her anxiety medication and wanted her to take another evaluation exam for ADHD to see if it had worsened. She also noted that she had been referred to a therapist specializing in ADHD who was supposed to help her learn organization and time management skills.

62.    In this November 29, 2023, email, Ms. Moutawakil alerted Defendant that her doctor may recommend some other reasonable accommodations beyond what she had already requested.

63.    Despite these multiple communications expressing her struggles and explicitly asking for help, management failed to respond meaningfully or provide any support beyond telling her to "take care" of her health.

**Administrative Work and Off-the-Clock Requirements**

64.     Defendant's significant procedural change dramatically increased Ms. Moutawakil's administrative workload and created conditions requiring off-the-clock work.

65.     Prior to this change, administrative staff were responsible for sending patient reports to referring dentists after each patient visit. Under the new procedure implemented around 2021-2022, Defendant required each hygienist to personally write and send reports via email for every patient seen.

66.     This procedural change significantly increased the time required for administrative tasks. Each patient report took approximately 5-7 minutes to complete, depending on whether documents needed to be uploaded and the complexity of navigating the medical record software.

67.     Ms. Moutawakil saw approximately seven patients per day. The new reporting requirement therefore added approximately 35-49 minutes of administrative work to her daily workload.

68.     Due to her ADHD diagnosis, Ms. Moutawakil expressed her frustrations to Dr. Carlos concerning administrative work, namely writing notes and completing patient reports.

69.     Without accommodations and after losing her assistant, Ms. Moutawakil began to fall behind with administrative tasks.

70.     Ms. Moutawakil asked for additional assistance or extra time to finish these tasks. Dr. Carlos told her to complete her notes after "clocking out.," or, in other words, work overtime without additional pay.

71.     Dr. Carlos insisted that she should have finished the administrative work during the day, and if she did not, she needed to work for free to complete her duties.

12

72. Ms. Moutawakil was ordered to clock out at 6:00 PM, yet patients were frequently still being seen at 5:30 PM, making it impossible for her to complete her notes during work hours.

73. The time constraint was insurmountable; with the last patient appointment ending near the required punch-out time, Ms. Moutawakil could not complete notes for the last patient plus patient reports for the other patients seen that day (which took 35-49 minutes total), plus any backlogged reports from previous days.

74. Defendant's employee handbook provided that overtime would be allowed if pre-approved by the practice administrator, and that employees will only receive overtime pay if they worked more than 40 hours in a pay week (Wednesday through Tuesday) and preapproved this overtime with the office manager beforehand.

75. The handbook also stated that Monday was a non-patient day to allow administrative and clinical staff to prepare for the week and catch up on tasks they were not able to attend to during the previous week. However, in January 2023, management instructed all hygienists not to come into the office on Mondays, thereby eliminating this opportunity for Ms. Moutawakil to catch up on administrative tasks.

76. Due to the workload demands and time constraints, Ms. Moutawakil regularly stayed after clocking out to complete the required administrative tasks, including patient notes and email reports to referring dentists. This off-the-clock work occurred on a regular and recurring basis from approximately 2021-2022 through her termination on August 19, 2024.

77. Ms. Moutawakil requested to be compensated for this overtime work. Defendant refused her requests for paid overtime despite the substantial backlog of reports and the daily administrative burden that exceeded her paid work hours.

**Defendant Knowledge of Off-the-Clock Work**

78.    Defendant had actual knowledge that Ms. Moutawakil was performing off-the-clock work without compensation, as Dr. Carlos explicitly instructed Ms. Moutawakil to complete patient notes after clocking out, demonstrating direct knowledge that she would be working off the clock.

79.    In December 2023, Practice Manager Munazza Jamil sent text messages to Ms. Moutawakil inquiring about her clock-in status while Ms. Moutawakil was at the office working off the clock. During this exchange, Ms. Jamil asked what Ms. Moutawakil was doing at the office, and Ms. Moutawakil indicated she was stocking the room and working on reports after having clocked out.

80.    Ms. Moutawakil repeatedly communicated to management through emails and conversations that she was struggling to complete administrative tasks during paid hours, was falling behind with reports, and needed additional paid time or administrative support. Management was therefore aware that the workload exceeded the available paid time.

81.    Management denied requests for additional paid time or administrative support, yet continued to require completion of all administrative tasks, with actual knowledge that Ms. Moutawakil was completing this work off the clock.

82.    The doctors and management accepted the benefits of Ms. Moutawakil's off-the-clock work by receiving completed patient reports, treatment documentation, and administrative tasks without compensating her for the time required to complete them.

**Handbook Policies Violated by Defendant**

83.    Defendant's employee handbook provided that overtime would be allowed if pre-approved by the practice administrator, and that employees would receive overtime pay at time-

14

and-a-half for hours worked over 40 hours in a pay week (Wednesday through Tuesday) if preapproved with the office manager beforehand.

84.     The handbook also stated that Monday would serve as a a non-patient day to allow admin and clinical staff to prepare for the week in addition to catch up on tasks they were not able to attend to during the previous week.

85.     However, in January 2023, management instructed all hygienists not to come into the office on Mondays, thereby eliminating this administrative day during which Ms. Moutawakil could complete tasks without seeing patients. This elimination of Monday work reduced Ms. Moutawakil's hours and removed the designated time for catching up on administrative work.

86.     Additionally, the handbook provided that employees were encouraged to take up to a one-hour lunch break off the clock.

87.     However, Ms. Moutawakil was often not given this break due to running late with patients and the doctors' scheduling practices.

88.     Despite eliminating the Monday administrative time and denying lunch breaks, Defendant continued to require completion of all administrative tasks, forcing Ms. Moutawakil to work off the clock to fulfill job requirements.

**Pattern, Extent, and Impact of Wage Violations**

89.     From approximately 2021-2022 through August 19, 2024, Ms. Moutawakil regularly worked off the clock without compensation for hours worked in excess of 40 hours per week.

90.     Based on conservative estimates of 5-7 minutes per patient report for seven patients per day, Ms. Moutawakil worked approximately 35-49 minutes per day off the clock solely for

patient reports, not including time for patient notes, backlogged work, or other administrative tasks.

91.    Ms. Moutawakil worked five days per week from 2015 until January 2023, when Defendant reduced her schedule to four days per week by eliminating Monday work. Even at four days per week, the off-the-clock work totaled approximately 2.33-3.27 hours per week for patient reports alone.

92.    Defendant failed to maintain accurate records of all hours Ms. Moutawakil worked, including the off-the-clock hours she spent completing required administrative tasks.

**The May 2024 Incidents and Initial Leave**

93.    Throughout early 2024, management continued to ignore Ms. Moutawakil's repeated requests for assistance in the office. By May 2024, Ms. Moutawakil's condition had significantly deteriorated due to the practice's ongoing failure to accommodate her and its retaliatory denial of necessary equipment and support.

94.    On May 15, 2024, while at the reception area, Ms. Moutawakil was sobbing. The Office Manager, Juan Arellano, asked if everything was okay, which resulted in an emotional response from Ms. Moutawakil

95.    The day after, Ms. Moutawakil experienced another traumatic episode. She was trying desperately to manage the situation by getting a doctor involved to care for her patient and coordinate with the scheduler. Instead of providing support, Mr. Arellano sent Ms. Moutawakil home for the day.

96.    Also on May 16, 2024, Ms. Moutawakil communicated separately with Practice Administrator Munazza Jamil and Mr. Arellano about her mental health concerns and need for time off. Ms. Jamil responded that Ms. Moutawakil should prioritize her health.

16

97.     Ms. Moutawakil then asked for additional time off, offering to work part time as a temporary accommodation. Ms. Jamil responded: "Talk to your doctor and after that we can tailor something as needed."

98.     Ms. Moutawakil was provided with two weeks off and told to "get back on track and we can talk in 2 weeks."

**The Resignation Dispute and Request for Extended Leave**

99.     In early June 2024, Ms. Moutawakil reached out to management to ask when she could return to work. On June 4, 2024, Ms. Jamil emailed Ms. Moutawakil stating they had taken her May 16, 2026, email as a resignation.[1]

100.    Ms. Moutawakil immediately replied that she had not resigned and was ready to return to work after the two-week leave that Defendant told her to take.

101.    Ms. Moutawakil explained that the text message about the island job was in jest and offered to take extended leave if necessary. She stated that she could ask her doctor for a letter for extended leave and again brought up the fact that Defendant had failed to provide her with reasonable accommodations as required by the ADA since early 2023 even though her symptoms were clearly tied to the challenges in the workplace.

**Medical Certification and Approved Leave Extension**

102.    Following this exchange, Defendant quickly began backtracking on its claim that Ms. Moutawakil had resigned.

103.    On June 6, 2024, Ms. Jamil responded to Ms. Moutawakil with two options for her return; either provide a Fitness for Duty Certification to return immediately, or request extended medical leave with medical certification.

---

[1] On May 16, 2024, Ms. Moutawakil sent a text message to the doctors about receiving a job offer in St. Croix, Virgin Islands. This was clearly sent in jest, as that position would not even be available for another year.

104. On June 23, 2024, Ms. Moutawakil provided a Fitness for Duty Certification of her indicating that Ms. Moutawakil was not released to work until at least August 16, 2024.

87. The Medical Leave Certification documented Ms. Moutawakil's diagnoses as Major Depressive Disorder (recurrent, moderate), ADHD (inattentive type), panic disorder, and Premenstrual Dysphoric Disorder.

88. On July 3, 2024, Defendant sent Ms. Moutawakil a letter approving the requested extension, but threatened the inability to facilitate further extensions, indicating Defendant's decision to deny any further accommodations, despite not knowing what those accommodations would entail.

**Request for Additional Extension and Termination**

93. On August 15, 2024, Ms. Moutawakil requested an additional accommodation of a modified schedule permitting her to attend treatment on Monday, Wednesday, and Friday mornings through September 4, 2024, stating that she was available all day Tuesdays and Thursdays, while also available after part time on treatment days until the end of treatment on 9/4, only sixteen working days later.

94. On August 19, 2024, Defendant terminated Ms. Moutawakil employment by letter.

95. Despite the clear request for a 16-day accommodation with a modified work schedule, Defendant unilaterally decided that the "leave requests and extensions appear indefinite."

96. Despite Ms. Moutawakil's offer to work a reduced or modified schedule during her continued treatment through September 4, 2024, Defendant did not engage in any interactive process regarding this potential accommodation. Instead, Defendant immediately terminated Ms. Moutawakil's employment.

18

**COUNT I**
**DISABILITY DISCRIMINATION IN VIOLATION OF**
**THE AMERICANS WITH DISABILITIES ACT**
**[42 U.S.C. § 12112(a)]**

97.    Ms. Moutawakil incorporates by reference paragraphs 1 through 96 as alleged above.

98.    The Americans with Disabilities Act makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

99.    At all relevant times, Defendant was an "employer" within the meaning of the ADA, employing fifteen or more employees, and Ms. Moutawakil was an "employee" within the meaning of the ADA.

108.    Ms. Moutawakil is an individual with disabilities within the meaning of the ADA. Ms. Moutawakil has been diagnosed with attention deficit hyperactivity disorder (ADHD), anxiety, depression, panic disorder, and Premenstrual Dysphoric Disorder (PMDD), which substantially limit major life activities including concentration, memory, communication, breathing, and work performance.

109.    Defendant was aware of Ms. Moutawakil's disabilities, possessed records of Ms. Moutawakil's disabilities including medical certifications from her treating psychiatrist, and regarded her as disabled. Management referred Ms. Moutawakil to a psychiatrist in Spring 2022, and Dr. Carlos stated he was "not surprised" by her ADHD diagnosis in July 2022.

110.    Ms. Moutawakil was qualified to perform the essential functions of her position as a Registered Dental Hygienist with or without reasonable accommodation. Ms. Moutawakil

worked successfully for Defendant for approximately nine years, consistently received positive performance reviews, and her April 2023 evaluation noted that "Patients love you!"

111.   Defendant subjected Ms. Moutawakil to adverse employment actions because of her disabilities, including:

    a.   significantly reducing Ms. Moutawakil's work hours beginning in January 2023 by eliminating Monday work, thereby substantially limiting her income;

    b.   subjecting Ms. Moutawakil to heightened scrutiny and increased monitoring that other employees did not face, including sending frequent text messages questioning her whereabouts before shifts and confronting her when she used the bathroom or took breaks;

    c.   removing critical workplace support that Ms. Moutawakil needed to manage her disability-related symptoms by reassigning her trained dental assistant elsewhere;

    d.   requiring Ms. Moutawakil to complete administrative work off the clock without compensation, despite knowing that her ADHD made it difficult for her to complete these tasks during the workday and despite eliminating the Monday administrative time provided in the employee handbook; and,

    e.   ultimately terminating Ms. Moutawakil's employment on August 19, 2024, after she requested an additional 16-day extension of accommodations through September 4, 2024, with an offer to work a modified schedule.

112.   Defendant treated similarly situated non-disabled employees more favorably than Ms. Moutawakil. Other hygienists who did not have disabilities were not subjected to the same heightened scrutiny regarding their whereabouts, were not required to work off the clock to

20

complete administrative tasks and were not denied the Monday administrative time provided in the handbook.

117. As a direct and proximate result of Defendant's discriminatory conduct, Ms. Moutawakil has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future wages and income, loss of employment benefits including health insurance and 401(k) contributions, potential 401(k) loan default and tax penalties, mental anguish, emotional distress, humiliation, worsening of her disability-related symptoms requiring increased medical treatment and medication, and other compensable damages.

118. Defendant's discriminatory conduct was willful and in callous disregard of Ms. Moutawakil's federally protected rights.

119. As a result of Defendant's conduct as alleged herein, Ms. Moutawakil is entitled to back pay, front pay, compensatory damages, and reasonable attorneys' fees and cost.

## COUNT II
## FAILURE TO ACCOMMODATE IN VIOLATION OF
## THE AMERICANS WITH DISABILITIES ACT
## [42 U.S.C. § 12112(b)(5)(A)]

120. Ms. Moutawakil incorporates by reference paragraphs 1 through 96 as alleged above.

121. The ADA provides that the term "discriminate against a qualified individual on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

122. Ms. Moutawakil requested multiple reasonable accommodations to assist her in performing the essential functions of her position as a Registered Dental Hygienist.

123. Ms. Moutawakil requested half-days during the November 2023 period when all hygienists were required to work at the Falls Church location due to renovations, suggesting that another hygienist could share her hours to help manage her disability-related stress and symptoms.

124. In December 2023, Ms. Moutawakil requested schedule modifications to either take Wednesday afternoons off or leave work two hours early to attend therapy appointments with an ADHD specialist, as recommended by her treating psychiatrist. Ms. Moutawakil offered to make up the hours on a different day or work through lunch to accommodate this request.

125. On December 6, 2023, Ms. Moutawakil formally requested workplace accommodations including an EMS airflow prophymaster to save time and reduce physical strain on her back, a second treatment room, a door for noise reduction, an office space to rest away from stimulation, and her own desktop computer to complete administrative notes.

126. Ms. Moutawakil requested administrative support or additional time to complete patient notes and reports, which she struggled to finish during the workday due to her ADHD.

127. Defendant knew and should have known of Ms. Moutawakil's disabilities and limitations. Management was aware of Ms. Moutawakil's symptoms as early as Spring 2022 when they referred her to a psychiatrist. Defendant received formal notice of Ms. Moutawakil's ADHD and anxiety diagnosis in July 2022, her PMDD diagnosis in January 2024, and multiple medical certifications documenting her disabilities and functional limitations.

128. The accommodations requested by Ms. Moutawakil were reasonable and would not have imposed an undue hardship on Defendant's operations. The schedule modifications would have allowed Ms. Moutawakil to make up her hours at different times. The equipment and

workspace modifications were standard workplace items. The administrative support had previously been provided to Ms. Moutawakil when she had an assistant.

129. Defendant failed to engage in the interactive process in good faith. When Ms. Moutawakil made accommodation requests, Defendant either summarily denied them citing "production loss" or ignored them entirely without discussing alternatives or explaining how they would impose an undue hardship.

130. When Dr. Gouldin was directly asked by Ms. Moutawakil about accommodations in March 2024, he stated "I don't want to get involved," refusing to participate in any interactive process due to interpersonal issues with Defendant personnel.

131. Defendant denied Ms. Moutawakil's accommodation requests without legitimate justification. Defendant's stated reason that schedule modifications would cause "production loss" was contradicted by Ms. Moutawakil's offer to make up the hours, and by the fact that another hygienist could cover the Wednesday afternoon time.

132. Defendant eliminated the Monday administrative time that had been provided in the employee handbook, removing an accommodation that helped Ms. Moutawakil manage her disability-related difficulties with administrative tasks.

133. With reasonable accommodation, Ms. Moutawakil could have performed the essential functions of her position. Ms. Moutawakil successfully performed her clinical duties throughout her nine-year tenure and received consistent positive feedback about her patient care. Her only struggles were with administrative tasks, which could have been accommodated through schedule modifications, additional support, or additional time.

134. As a direct and proximate result of Defendant's failure to accommodate, Ms. Moutawakil has suffered and will continue to suffer considerable injury, including but not limited

23

to loss of substantial past and future wages and income, loss of employment benefits, mental anguish, emotional distress, worsening of her disability-related symptoms, and other compensable damages.

135.   As a result of Defendant's conduct as alleged herein, Ms. Moutawakil is entitled to back pay, front pay, compensatory damages, and reasonable attorneys' fees and costs.

## COUNT III
## RETALIATION IN VIOLATION OF
## THE AMERICANS WITH DISABILITIES ACT
## [42 U.S.C. § 12203(a)]

136.   Ms. Moutawakil incorporates by reference paragraphs 1 through 96 as alleged above.

137.   The ADA prohibits retaliation against individuals who engage in protected activity, providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

138.   Ms. Moutawakil engaged in protected activity under the ADA. Beginning in February 2023, Ms. Moutawakil requested accommodations for her disabilities. She sent emails to management in November 2023 and December 2023 explicitly describing her struggles with anxiety, depression, and ADHD, and requesting help and accommodations.

139.   Ms. Moutawakil requested medical leave in May 2024 and provided medical certifications documenting her disabilities and need for leave through August 2024.

140.   Ms. Moutawakil engaged in protected activity when she informed management on June 4, 2024, that her condition was medical in nature and that she had repeatedly asked for accommodations, and that her disability was a protected class by the ADA.

24

141.    Defendant subjected Ms. Moutawakil to adverse employment actions after she engaged in protected activity. After Ms. Moutawakil began requesting accommodations in early 2023, Defendant increased scrutiny of her movements, frequently texting her about her whereabouts and confronting her when she took breaks or used the bathroom.

142.    In December 2023, after Ms. Moutawakil's formal accommodation request email, Defendant denied all requested items without explanation or discussion of alternatives.

143.    After Ms. Moutawakil requested schedule accommodations for therapy appointments recommended by her psychiatrist, Defendant denied the request citing "production loss," despite Ms. Moutawakil's offer to make up the hours.

144.    After Ms. Moutawakil took protected medical leave in May 2024 and asserted her rights under the ADA in June 2024, Defendant attempted to characterize her leave as a resignation and ultimately terminated her employment on August 19, 2024.

145.    A causal connection exists between Ms. Moutawakil's protected activity and the adverse actions taken against her. The temporal proximity between Ms. Moutawakil's accommodation requests and the adverse actions demonstrates causation.

   a.    The increased scrutiny and confrontations began shortly after Ms. Moutawakil's initial accommodation requests in early 2023;

   b.    The denial of equipment and workspace accommodations occurred immediately after her December 6, 2023, formal request; and,

   c.    The termination occurred shortly after Ms. Moutawakil's June 2024 assertion of her ADA rights.

146.    Defendant's stated reasons for its adverse actions were pretextual. Defendant claimed Ms. Moutawakil could not return to work and that the leave was "indefinite," but Ms.

25

Moutawakil had provided a specific return date of September 4, 2024, with an offer to work a modified schedule during that time.

147.   Defendant's claim that it could not accommodate Ms. Moutawakil's schedule modifications due to "production loss" was pretextual, as Ms. Moutawakil offered multiple ways to make up the hours and another hygienist could have covered the time.

148.   As a direct and proximate result of Defendant's retaliatory conduct, Ms. Moutawakil has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future wages and income, loss of employment benefits, mental anguish, emotional distress, humiliation, worsening of her disability-related symptoms, and other compensable damages.

149.   Defendant's retaliatory conduct was willful and in callous disregard of Ms. Moutawakil's federally protected rights.

150.   As a result of Defendant's conduct as alleged herein, Ms. Moutawakil is entitled to back pay, front pay, compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

**COUNT IV**
**NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**[42 U.S.C. § 2000e *et seq.*]**

151.   Ms. Moutawakil incorporates by reference paragraphs 1 through 96 as alleged above.

152.   Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

153.    At all relevant times, Defendant was an "employer" within the meaning of Title VII, employing fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and Ms. Moutawakil was an "employee" within the meaning of Title VII.

154.    Ms. Moutawakil is Hispanic, of Mexican and Colombian descent, and thus a member of a protected class based on national origin under Title VII. Spanish is Ms. Moutawakil's native language.

155.    Ms. Moutawakil was qualified for her position as a Registered Dental Hygienist. Ms. Moutawakil worked successfully for Defendant for approximately nine years, from April 2015 through August 2024, consistently received positive performance reviews, and her April 2023 evaluation noted that "Patients love you!"

156.    Defendant subjected Ms. Moutawakil to adverse treatment in the terms and conditions of employment because of her national origin. On multiple occasions, both Dr. Francisco Carlos and Dr. A. Garrett Gouldin admonished Ms. Moutawakil not to communicate with other Spanish-speaking coworkers in Spanish. They claimed that speaking Spanish was "unprofessional" and was not permitted in the office.

157.    Defendant's language restriction was not based on any legitimate business necessity. The restriction applied to all Spanish language use in the workplace, not merely during patient interactions or other situations where business necessity might arguably exist. Defendant failed to articulate any business justification for prohibiting Spanish language use among coworkers.

158.    Defendant treated similarly situated employees of different national origins more favorably than Ms. Moutawakil. No adverse action was taken against non-Hispanic employees for speaking languages other than English in the office.

159.    Being policed for speaking her native language created a hostile work environment based on Ms. Moutawakil 's national origin. The language restriction added to Ms. Moutawakil 's growing stress and sense of isolation in the workplace, creating an environment where she constantly felt scrutinized and exacerbating her anxiety. The repeated admonishments from multiple supervisors and owners of the practice, combined with the characterization of her native language as "unprofessional," created an intimidating, hostile, and offensive working environment.

160.    As a direct and proximate result of Defendant's discriminatory conduct, Ms. Moutawakil has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future wages and income, loss of employment benefits including health insurance and 401(k) contributions, potential 401(k) loan default and tax penalties, mental anguish, emotional distress, humiliation, exacerbation of her mental health conditions, and other compensable damages.

161.    Defendant's discriminatory conduct was willful and in callous disregard of Ms. Moutawakil's federally protected rights.

162.    As a result of Defendant's conduct as alleged herein, Ms. Moutawakil is entitled to back pay, front pay, compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

28

**COUNT V**
**DISABILITY DISCRIMINATION IN VIOLATION OF**
**THE VIRGINIA HUMAN RIGHTS ACT**
**[Va. Code Ann. § 2.2-3905(A)]**

163.    Ms. Moutawakil incorporates by reference paragraphs 1 through 96 as alleged above.

164.    The Virginia Human Rights Act makes it unlawful for an employer "to discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment, because of such individual's . . . disability." Va. Code Ann. § 2.2-3905(A).

165.    At all relevant times, Defendant was an "employer" within the meaning of the VHRA, employing fifteen or more employees, and Ms. Moutawakil was an "employee" within the meaning of the VHRA.

166.    Ms. Moutawakil is an individual with disabilities recognized under the VHRA. Ms. Moutawakil has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), anxiety, depression, Panic Disorder, and Premenstrual Dysphoric Disorder (PMDD), which substantially limit major life activities.

167.    Defendant discriminated against Ms. Moutawakil in the terms, conditions, and privileges of employment because of her disabilities. Defendant reduced Ms. Moutawakil's work hours beginning in January 2023 by eliminating Monday work, substantially limiting her income. Defendant subjected Ms. Moutawakil to heightened scrutiny and increased monitoring, including frequent text messages questioning her whereabouts and confrontations when she used the bathroom or took breaks.

168.    Defendant failed to make reasonable accommodation for Ms. Moutawakil's known disabilities. Ms. Moutawakil requested schedule modifications to attend therapy appointments,

29

administrative support, additional time for administrative tasks, and equipment accommodations. Defendant denied these requests without legitimate justification or meaningful interactive process.

169.    Defendant removed critical workplace support that Ms. Moutawakil needed to manage her disability-related symptoms. After Ms. Moutawakil trained a dental assistant who helped her complete administrative tasks, Defendant reassigned the assistant elsewhere, removing the crucial support upon which Ms. Moutawakil had become reliant.

170.    Defendant's adverse actions included denial of accommodations, constructive discharge, and termination. On August 19, 2024, Defendant terminated Ms. Moutawakil's employment after she requested an additional 16-day extension of medical leave through September 4, 2024, to complete her Intensive Outpatient Program treatment, with an offer to work a modified schedule.

171.    As a direct and proximate result of Defendant's discriminatory conduct, Ms. Moutawakil has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future wages and income, loss of employment benefits, mental anguish, emotional distress, worsening of her disability-related symptoms, and other compensable damages.

172.    As a result of Defendant's conduct as alleged herein, Ms. Moutawakil is entitled to compensatory damages, back pay, front pay, and reasonable attorneys' fees and costs.

**COUNT VI**
**NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF**
**THE VIRGINIA HUMAN RIGHTS ACT**
**[Va. Code Ann. § 2.2-3905(A)]**

173.    Ms. Moutawakil incorporates by reference paragraphs 1 through 96 as alleged above.

174. The Virginia Human Rights Act makes it unlawful for an employer "to discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, [or] national origin." Va. Code Ann. § 2.2-3905(A).

175. At all relevant times, Defendant was an "employer" within the meaning of the VHRA, and Ms. Moutawakil was an "employee" within the meaning of the VHRA.

176. Ms. Moutawakil is Hispanic, of Mexican and Colombian descent, and thus a member of a protected class based on national origin under the VHRA. Spanish is Ms. Moutawakil's native language.

177. Ms. Moutawakil was qualified for her position as a Registered Dental Hygienist. Ms. Moutawakil worked successfully for Defendant for approximately nine years, consistently received positive performance reviews, and her April 2023 evaluation noted that "Patients love you!"

178. Defendant subjected Ms. Moutawakil to adverse treatment in the terms and conditions of employment because of her national origin. On multiple occasions, both Dr. Francisco Carlos and Dr. A. Garrett Gouldin told Ms. Moutawakil and Spanish-speaking coworkers not to speak Spanish at work.

179. Speaking Spanish was characterized as "unprofessional" by management. This language restriction was not based on any legitimate business necessity, and no adverse action was taken against non-Hispanic employees for speaking languages other than English in the office.

180. This disparate treatment created a hostile work environment and contributed to constructive discharge. Being policed for speaking her native language added to Ms. Moutawakil's

growing stress and sense of isolation in the workplace, creating an environment where she constantly felt scrutinized and exacerbating her anxiety.

181.    As a direct and proximate result of Defendant's discriminatory conduct, Ms. Moutawakil has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future wages and income, loss of employment benefits, mental anguish, emotional distress, humiliation, and other compensable damages.

182.    As a result of Defendant's conduct as alleged herein, Ms. Moutawakil is entitled to compensatory damages, back pay, front pay, and reasonable attorneys' fees and costs.

## COUNT VII
## RETALIATION IN VIOLATION OF
## THE VIRGINIA HUMAN RIGHTS ACT
## [Va. Code Ann. § 2.2-3905(B)]

183.    Ms. Moutawakil incorporates by reference paragraphs 1 through 96 as alleged above.

184.    The Virginia Human Rights Act makes it unlawful for an employer to "discriminate against any . . . employee . . . because that person has opposed any practice forbidden by" the VHRA. Va. Code Ann. § 2.2-3905(B)(7).

185.    At all relevant times, Defendant was an "employer" within the meaning of the VHRA, and Ms. Moutawakil was an "employee" within the meaning of the VHRA.

186.    Ms. Moutawakil engaged in protected activity by opposing discrimination. Beginning in February 2023, Ms. Moutawakil requested accommodations for her disabilities. On November 16, 2023, and December 6, 2023, Ms. Moutawakil sent emails to management explicitly describing her struggles and requesting accommodations.

187.    Ms. Moutawakil requested medical leave in May 2024 and provided medical certifications documenting her disabilities. On June 4, 2024, Ms. Moutawakil asserted that her

32

condition was medical in nature, that she had repeatedly asked for accommodations, and that her disability was a protected class by the ADA.

188. Defendant subjected Ms. Moutawakil to adverse actions in response to her protected activity. After Ms. Moutawakil began requesting accommodations in early 2023, Defendant increased scrutiny of her movements, frequently texting her about her whereabouts and confronting her when she took breaks.

189. In December 2023, after Ms. Moutawakil's formal accommodation request email, Defendant denied all requested items without explanation. After Ms. Moutawakil requested schedule accommodations for therapy appointments, Defendant denied the request citing "production loss," despite Ms. Moutawakil's offer to make up the hours.

190. After Ms. Moutawakil took protected medical leave and asserted her rights in June 2024, Defendant ultimately terminated her employment on August 19, 2024, following her request for an additional 16-day leave extension with an offer to work a modified schedule.

191. A causal connection exists between Ms. Moutawakil's protected activity and the adverse actions taken against her. The temporal proximity between Ms. Moutawakil's accommodation requests and the adverse actions demonstrates causation.

192. Defendant's articulated reasons for the adverse actions were pretextual. Defendant claimed Ms. Moutawakil could not return to work and that the leave was "indefinite," but Ms. Moutawakil had provided a specific return date of September 4, 2024, and offered to work a modified schedule.

193. As a direct and proximate result of Defendant's retaliatory conduct, Ms. Moutawakil has suffered and will continue to suffer considerable injury, including but not limited

33

to loss of substantial past and future wages and income, loss of employment benefits, mental anguish, emotional distress, humiliation, and other compensable damages.

194.    As a result of Defendant's conduct as alleged herein, Ms. Moutawakil is entitled to compensatory damages, back pay, front pay, and reasonable attorneys' fees and costs.

## COUNT VIII
## VIOLATIONS OF THE FAIR LABOR STANDARDS ACT
### [29 U.S.C. § 207(a), § 216]

195.    Ms. Moutawakil incorporates by reference paragraphs 1 through 96 as alleged above.

196.    The Fair Labor Standards Act provides that "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

197.    At all relevant times, Defendant was an "employer" engaged in interstate commerce and covered by the FLSA. Defendant operates a periodontics practice with multiple locations, purchases supplies and equipment from out-of-state vendors, and has gross revenues exceeding $500,000 annually.

198.    Ms. Moutawakil was a non-exempt employee entitled to overtime compensation under the FLSA. As a Registered Dental Hygienist, Ms. Moutawakil was paid on an hourly basis and did not meet any exemption criteria under 29 U.S.C. § 213. No exemption under the FLSA applies to Ms. Moutawkil's position.

199.    Ms. Moutawakil regularly worked more than 40 hours per week due to off-the-clock work requirements. Ms. Moutawakil worked her scheduled on-the-clock hours plus additional unpaid hours completing administrative tasks after clocking out.

200.    From approximately 2021-2022 through January 2023, Ms. Moutawakil worked five days per week. From January 2023 through May 2024, Ms. Moutawakil worked four days per week. In both periods, Ms. Moutawakil's total compensable hours, including off-the-clock work, exceeded 40 hours per week on a regular and recurring basis.

201.    The off-the-clock work was regular, not occasional. Ms. Moutawakil performed off-the-clock administrative work on a consistent basis throughout the three-year statute of limitations period, including completing patient reports for approximately seven patients per day at 5-7 minutes per report, completing patient notes after seeing patients until shortly before closing while required to clock out at 6:00 PM, and catching up on backlogged reports.

202.    Defendant eliminated opportunities for Ms. Moutawakil to complete administrative work during paid hours, further forcing off-the-clock work by eliminated Monday work for all hygienists, removing the administrative day during which Ms. Moutawakil could complete tasks without seeing patients. This elimination removed a critical time buffer that had allowed Ms. Moutawakil to manage her administrative workload within paid hours.

203.    Defendant failed to compensate Ms. Moutawakil for all hours worked and failed to pay overtime at time-and-a-half (1.5 times her regular rate) for hours worked in excess of forty hours per week, despite being aware that Ms. Moutawakil was performing work duties off the clock.

35

204.    Defendant failed to pay Ms. Moutawakil any compensation whatsoever for the off-the-clock hours she worked, much less the overtime premium of one-and-one-half times her regular rate required under 29 U.S.C. § 207(a)(1).

205.    Dr. Carlos explicitly instructed Ms. Moutawakil to complete patient notes after clocking out, demonstrating direct actual knowledge that Ms. Moutawakil would be working off the clock to complete required tasks.

206.    Defendant also had constructive knowledge of Ms. Moutawakil's off-the-clock work, as Defendant's own policies created the conditions requiring off-the-clock work, such as the 2021-2022 procedural change transferring administrative work to hygienists, the requirement to clock out at 6:00 PM while seeing patients until shortly before, the elimination of Monday administrative time, and the denial of lunch breaks.

207.    Similarly, Defendant's time-tracking systems, including electronic time clocks and medical record software where Ms. Moutawakil had her own username and password, would have shown Ms. Moutawakil completing patient reports and accessing medical records after her recorded clock-out times, providing Defendant with constructive knowledge of off-the-clock work.

208.    Defendant accepted the benefits of Ms. Moutawakil's off-the-clock work by receiving completed patient reports, treatment documentation, and administrative tasks.

209.    Defendant failed to maintain accurate records of all hours Ms. Moutawakil worked, including the off-the-clock hours she spent completing required administrative tasks after punching out.

210.    Defendant's violations were willful and showed reckless disregard of FLSA requirements.

211. As a direct and proximate result of Defendant's violations, Ms. Moutawakil has suffered loss of wages for unpaid overtime hours worked.

212. As a result of Defendant's conduct as alleged herein, Ms. Moutawakil is entitled to unpaid wages, liquidated damages equal to the amount of unpaid wages pursuant to 29 U.S.C. § 216(b), prejudgment and post-judgment interest, and reasonable attorneys' fees and costs as provided by 29 U.S.C. § 216(b).

**COUNT IX**
**VIOLATIONS OF THE VIRGINIA OVERTIME WAGE ACT**
**[Va. Code Ann. § 40.1-29.2]**

213. Ms. Moutawakil incorporates by reference paragraphs 1 through 96 as alleged above.

214. The Virginia Overtime Wage Act provides that "[a]ny employer that violates the overtime pay requirements of the federal Fair Labor Standards Act . . . shall be liable to the employee for the applicable remedies . . . under the federal Fair Labor Standards Act in an action brought pursuant to the process in subsection J of § 40.1-29." Va. Code Ann. § 40.1-29.2.

215. Defendant violated the overtime pay requirements of the FLSA as alleged in Count VIII above. Defendant required Ms. Moutawakil to work over 40 hours per week without paying the required overtime premium of 1.5 times her regular rate for hours worked over 40 in a workweek.

216. At all relevant times, Defendant was an employer subject to the Virginia Overtime Wage Act, operating periodontics offices in Falls Church and Alexandria, Virginia.

217. Ms. Moutawakil performed work for Defendant in Virginia throughout her employment from April 2015 through August 19, 2024.

218.    Defendant failed to pay Ms. Moutawakil at the one-and-one-half times premium rate for hours she worked above forty hours per week. Defendant failed to pay Ms. Moutawakil any compensation whatsoever for off-the-clock hours worked, much less the required overtime premium.

219.    As a direct and proximate result of Defendant's violations, Ms. Moutawakil has suffered loss of wages for unpaid overtime hours worked.

220.    Pursuant to Va. Code Ann. § 40.1-29.2, Ms. Moutawakil is entitled to the applicable remedies under the FLSA, including unpaid overtime wages, liquidated damages equal to the amount of unpaid wages, prejudgment and post-judgment interest, and reasonable attorneys' fees and costs.

## COUNT X
## VIOLATIONS OF THE VIRGINIA WAGE PAYMENT ACT
### [Va. Code Ann. § 40.1-29]

221.    Ms. Moutawakil incorporates by reference paragraphs 1 through 96 as alleged above.

222.    The Virginia Wage Payment Act requires employers to pay all wages due to employees for work performed and prohibits employers from withholding wages except for specific authorized purposes. Va. Code Ann. § 40.1-29 *et seq*.

223.    At all relevant times, Defendant was an employer subject to the Virginia Wage Payment Act, operating periodontics offices in Falls Church and Alexandria, Virginia.

224.    Ms. Moutawakil performed work for Defendant in Virginia throughout her employment from April 2015 through August 19, 2024.

225.    Defendant failed to pay Ms. Moutawakil all wages due for all hours worked. Defendant required Ms. Moutawakil to perform off-the-clock work by completing administrative

38

tasks after clocking out at 6:00 PM while seeing patients until 5:30 PM, writing and sending patient reports, and completing backlogged administrative work.

226.    Defendant failed to pay Ms. Moutawakil for work time when she was denied breaks. The employee handbook provided that employees were encouraged to take up to a one-hour lunch break off the clock. Ms. Moutawakil was frequently denied this break due to scheduling practices, requiring her to work through unpaid lunch periods without compensation.

227.    Beginning in January 2023, Defendant eliminated Monday work for hygienists, removing the administrative day during which Ms. Moutawakil could complete tasks, thereby forcing her to complete administrative work off the clock on other days without compensation.

228.    Defendant withheld wages from Ms. Moutawakil without written and signed authorization in violation of the VWPA.

229.    Defendant required Ms. Moutawakil to perform compensable work but failed to pay wages for that work, effectively withholding compensation without authorization.

230.    Upon termination of Ms. Moutawakil's employment on August 19, 2024, Defendant failed to pay Ms. Moutawakil all wages due for work performed, including unpaid wages for off-the-clock work performed during her employment.

231.    Defendant knowingly failed to pay wages to Ms. Moutawakil in accordance with the VWPA.

232.    Defendant had actual knowledge that Ms. Moutawakil was performing off-the-clock work without compensation. Dr. Carlos explicitly instructed Ms. Moutawakil to complete notes after clocking out. Practice Manager Munazza Jamil sent text messages in December 2023 confirming that Ms. Moutawakil had clocked out but was still at the office working. Ms.

39

Moutawakil repeatedly informed management that she was struggling to complete tasks during paid hours and needed additional help or time.

233. Defendant acted in reckless disregard of its wage payment obligations by implementing policies that made it impossible for Ms. Moutawakil to complete required work during paid hours (requiring clock-out at 6:00 PM while seeing patients until 5:30 PM), eliminating the Monday administrative time that provided catch-up opportunities, denying requests for paid overtime despite knowledge of excessive workload, and accepting the benefits of Ms. Moutawakil's completed administrative work while refusing to compensate her for the time required.

234. Defendant's knowing failure to pay wages is further evidenced by the fact that management was aware through the December 2023 text messages and Ms. Moutawakil's repeated communications that she was working off the clock, yet Defendant took no action to either compensate Ms. Moutawakil for this time or prevent the off-the-clock work from occurring.

235. As a direct and proximate result of Defendant's violations, Ms. Moutawakil has suffered loss of wages for unpaid work hours, denied breaks, and off-the-clock administrative work.

236. As a result of Defendant's conduct as alleged herein, Ms. Moutawakil is entitled to unpaid wages, treble damages equal to three times the amount of unpaid wages, prejudgment interest, and reasonable attorneys' fees and costs as provided by the VWPA.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Ms. Moutawakil respectfully requests that this Court enter a judgment:

40

a. Declaring that Defendant violated the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, the Virginia Human Rights Act, the Fair Labor Standards Act, the Virginia Overtime Wage Act, and the Virginia Wage Payment Act;

b. Permanently enjoining Defendant from future violations of these statutes;

c. Awarding back pay for lost wages from the date of termination to the date of judgment, plus prejudgment interest;

d. Awarding front pay in lieu of reinstatement;

e. Awarding compensatory damages for emotional distress, mental anguish, humiliation, and other non-economic harms caused by Defendant's unlawful conduct;

f. Awarding unpaid wages for all off-the-clock work performed by Ms. Moutawakil;

g. Awarding liquidated damages under the Fair Labor Standards Act equal to the amount of unpaid wages;

h. Awarding liquidated damages under the Virginia Overtime Wage Act equal to the amount of unpaid overtime wages;

i. Awarding treble damages under the Virginia Wage Payment Act for Defendant's knowing failure to pay wages;

j. Awarding punitive damages for Defendant's willful and malicious conduct in violation of the ADA and Title VII;

k. Awarding compensation for lost benefits, including 401(k) contributions, health insurance premiums, and 401(k) loan balance at risk of default, plus early withdrawal penalties;

l. Awarding costs and expenses of this action;

m.    Awarding reasonable attorneys' fees;

n.    Awarding prejudgment and post-judgment interest at the lawful rate; and

o.    Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Ms. Moutawakil demands

a trial by jury on all claims so triable.

Respectfully submitted,
*/s/ Francisco E. Mundaca*
Francisco E. Mundaca, Esq.
VSB No.: 96073
THE MUNDACA LAW FIRM, LLC
1997 Annapolis Exchange Parkway, Suite 300
Annapolis, Maryland 21401
Telephone: (202) 474-8500
Facsimile: (240) 233-8626
Email: fmundaca@mundacalaw.com

*Counsel for Plaintiff,*
*Lisa Cardenas Moutawakil*

42